## Fuchsman v. Dallas & Mavis Forwarding Co., Inc.
### Case No. 1562
### Ross County (4th)
### Decided February 6, 1990
[Cite as 1 AOA 167]

*Hirsch, Stanhope & Co., L.P.A., Mr. Carl P. Hirsch, Jr., Chillicothe, Ohio, for Appellant,*

*Arter & Hadden, Mr. R. Douglas Wrightsel and Ms. Judith E. Trail, Columbus, Ohio, for Appellee.*

HARSHA, J.

This is an appeal from a judgment by entered by the Ross County Court of Common Pleas granting to Dallas & Mavis Forwarding Co., Inc., defendant-appellee, its motion for summary judgment on the intentional tort claim of Rita S. Fuchsman, Administratrix of the Estate of Roy W. Whisler, deceased, plaintiff-appellant.

Appellant assigns the following as her sole assignment of error:

A jury question is presented if the evidence in a workplace tort discloses that the employee was required to utilize a known hazardous procedure and reasonable minds could infer that the employers also knew that the utilization of said procedure was substantially certain to cause harm.

On August 13, 1982, Carolyn A. Whisler, wife of the decedent, Roy Wayne Whisler, and then administratrix of his estate, filed a complaint in her fiduciary capacity which alleged, in pertinent part, as follows. On or about, and prior to August 18, 1981, the decedent was and employee of appellee's Chillicothe, Ohio plant. He was a member of a crew of employees responsible for the transportation of semi-tractor trucks for various truck manufacturers, including the transportation of gliders, which were unfinished semi-tractor trucks lacking their own power or any positive braking system. On or about August 18, 1981, the decedent was ordered by appellee's supervisory employees to assist in the movement of gliders by towing the gliders with a flexible chain hooked to a pickup truck. On such date, while assisting in the movement of gliders at appellee's plant, the decedent was crushed between a glider and a pickup truck and subsequently died from the injuries sustained therefrom.

The August 13, 1982 complaint further alleged that appellee knew or should have known that the movement of gliders could be harmful to its employees when it forced its

employees to transport gliders without positive braking devices and employ a towing apparatus which did not include a positive braking device, and that, furthermore, appellee continued to force its employees to transport gliders without positive braking devices even though appellee knew or should have known that such conduct was in violation of industrial and government regulations and that other employees of appellee had been injured previously in transporting gliders without positive braking devices. Additionally, appellant alleged that appellee's conduct was intentional, malicious, and done with willful and wanton disregard of its employees' safety. Appellant's complaint prayed for $600,00 in compensatory damages and $500,000 in punitive damages. On September 27 1982, appellee filed an answer denying the substance of the charge of appellant's complaint.

On February 22, 1983, appellee, through its safety and personnel director at the date of the accident, Rolf G. Katzenstein, filed answers to interrogatories stating that there were no witnesses to the accident and no safety guidelines regarding appellee's towing of gliders at the time of the accident, that no other person had been injured by a towed vehicle or glider at any of appellee's facilities prior to the accident, that no glider had struck a towing vehicle prior to the accident when the same methods used at the time of the accident were used in towing the vehicle and that no employees had made any complaints concerning the towing method that was utilized on the date of the accident. Katzenstein further stated in such answers to interrogatories that appellee had paid a penalty levied by the Occupational Safety and Health Administration (OSHA) and that, following the August 18, 1981 accident, a rigid tow bar was utilized in the towing procedure in place of the flexible tow chain.

On October 27, 1983, appellant filed an amended complaint which effectively substituted appellant as the plaintiff therein in that she had been appointed administratrix of the decedent's estate subsequent to the filing of the original complaint. Appellant's amended complaint essentially reiterated the allegations of the original complaint.

In December of 1983, depositions of Mr. Katzenstein, Roy Keown, and Donald W. Schuettenberg were filed. On February 13 and 14, 1984, a jury trial was held at which, *inter alia*, Katzenstein's deposition was introduced into evidence and both Keown and Schuettenberg testified. The evidence adduced by the filed depositions and the trial exhibits and testimony reveals the following pertinent facts.

Schuettenberg, manager of appellee's Chillicothe facility since April, 1978, testified that he directly supervised employees at the location, was responsible for their continued employment, hired and fired personnel, made job assignments, and was also responsible for safety at the facility. At this facility, appellee was engaged in the transportation of, among other things, glider kits. A glider is a semi-tractor without certain component parts although they do contain steering mechanisms. Since a glider did not have any positive braking devices, there was no way of stopping them without the exertion of external forces, i.e. gravity or some other device. A dual glider assembly is two gliders assembled together - attached rear frame to rear frame with four wheels on the assembly and the approximate total weight being 16,000 pounds.

In August of 1981, approximately two dual glider assemblies were moved out from the shop into the yard. When the dual glider assemblies were ready to be shipped, the assemblies, which were not equipped with any positive braking devices, were towed back into the building with a flexible twenty foot long tow chain attached to a pickup truck. The pickup truck would pull the assemblies up a slight incline into the floor of the plant building which was almost level except for a slight decline where the sewer drain was located. Schuettenberg testified that somebody would either throw a wood block from a bin inside the building at one of the wheels of the dual glider assembly or that gravity itself would stop the assembly from continuing to move when the pickup truck stopped. According to Schuettenberg, he knew, prior to August, 1981 that this method of towing dual glider assemblies was being used although he stated that he would not label this method as hazardous.

Appellant's decedent had been working at appellee's Chillicothe facility since 1978 as driver and, as of January 6, 1981, joined three other employees as a shop worker, whose duties included the assembly and readying for transportation of the dual gliders. There was nothing written in the decedent's personnel file indicating that he had received training in the towing of dual glider assemblies. On August 18, 1981, Schuettenberg arrived at the plant facility around 8:00 A.M. and observed Roy

Keown driving the pickup truck towing one of the dual glider assemblies from the yard toward the shop with the decedent standing in the dual glider assembly to steer it. Schuettenberg did not observe the accident but was advised of the decedent's injuries by Keown shortly thereafter. Schuettenberg and Katzenstein admitted that there were no verbal or written policies for the safety of personnel regarding the movement of dual glider assemblies at the time of appellant's death.

Keown testified that he was the "lead man" of the four man crew of shop employees at appellee's Chillicothe facility. Keown was a member of the collective bargaining unit, was not a foreman, and was not paid at a higher hourly rate than the rest of the shop crew; however, he did have some supervisory characteristics, including the responsibility to train new hirees. According to Keown, prior to August 18, 1981, he and other shop members would ordinarily tow the dual gliders into the shop whereby one member would drive the pickup truck, one would steer the dual glider assembly which was attached to pickup truck with a twenty foot long flexible tow chain, and another shop member would stand inside the shop and throw a block of wood underneath one of the dual glider's wheels.

Although Keown stated that this three man method of towing the dual gliders was the most common, he further testified that "a lot of times", just two men towed the dual gliders. With a two man crew, Keown would get out of the pickup truck and either get a block of wood and throw it underneath one of the dual glider's wheels or, depending on how fast the dual glider was moving, he would walk back and "hold them." At no point would the person in the glider normally get out of the glider and attempt to stop it.

Keown further testified that during the time that appellant's decedent worked as a member of the crew, i.e., from January 6, 1981 to August 18, 1981, probably only three or four dual gliders were moved through the facility and only two dual gliders were taken into the yard and then towed back into the shop. On the morning of August 18, 1981, two of the four man crew had not yet arrived for work and Keown decided that he and the decedent would tow the dual glider assembly from the yard to the shop. Appellant's decedent offered no objection to this so Keown proceeded to drive the pickup truck as the decedent stood in the dual glider assembly as the steerer. Keown testified that as he stopped the pickup truck, he was about to get out and throw a wood block under the dual glider assembly but remained in the truck when he saw the decedent descend from the dual glider and he thought that the decedent was going to throw the wood block. Keown felt a slight bump, indicating that the dual glider assembly had hit the back of the pickup truck, and went toward the back of the truck, where he saw appellant's decedent sitting on the floor. Keown specifically noted that if appellant's decedent had gotten off the glider to interpose his body in front of it in order to prevent it from continuing to moved, that was a mistake.

Katzenstein testified that, at the date of the accident and immediately prior thereto, he was responsible in a corporate capacity for safety whereas, in a terminal capacity, the facility manager, i. e. Schuettenberg, was responsible for safety. According to Katzenstein, the safe methods for handling dual glider assemblies are to tow them using a rigid tow bar or to use a very short chain with padding placed between the rear of the truck and the front of the dual glider assembly. Katzenstein specified that he had known about these safe method for towing dual glider assemblies "for quite some time", that he was not aware that the gliders were being moved in the manner utilized by the Chillicothe facility prior to the August 18, 1981 incident, and that a rigid tow bar was not available at the facility at the relevant date.

Katzenstein was advised on that day of the incident and he promptly informed OSHA. On the following day, OSHA investigators came to the Chillicothe facility and conducted an investigation of the incident. Katzenstein testified that he agreed that the employees had been exposed to a hazard since they "had a dead employee", that no one at appellee's facility had told appellant's decedent that he was required to tow the dual glider assembly, and that he did not agree that the method used at the Chillicothe facility had exposed employees to the hazard of being crushed, caught, or struck by the free-wheeling glider unit because appellant's decedent had interposed himself between a truck and a glider.

OSHA investigators determined that appellee was guilty of the following violation of the Occupational Safety and Health Act of 1970:

The employer did not furnish employment and a place of employment which were free

from recognized hazards that were causing or were likely to cause death or serious physical harm to employees, in that:

a) In the storage yard and decking shed, glider units, which were not provided with positive braking means, were towed by a single chain, exposing employees to the hazard of being crushed, caught between or struck by the free-wheeling glider unit. Tow bars, wreckers or other methods to assure positive braking means, for the glider units, were not used.

Appellee was assessed a fine of $360 for such penalty, which was paid, and the violation was abated by the subsequent usage of rigid tow bars in lieu of the flexible tow chains in the towing of the dual glider assemblies. An investigative worksheet filled out by OSHA employees noted that opening and closing conferences were held with the terminal manager, corporate safety director, and union steward. Schuettenberg testified that such reference in the OSHA report referred to himself, Katzenstein, and Keown, respectively. Under the portion of the OSHA report entitled "EMPLOYER KNOWLEDGE", it noted that two people had stated during the closing conference that they "knew this was a hazard." An October 23, 1981 memorandum from Rolf Katzenstein to all terminal managers regarding the safe movement of glider kits was proffered by appellant but was not allowed into evidence at trial by the trial court.[1] It was uncontroverted that appellant's decedent's family received workers' compensation benefits as a result of his death.

At the conclusion of appellant's evidence at trial, appellee moved for a directed verdict. The trial court, after stating that there must be evidence of a "specific purpose to cause injury" to the employee in order to prove an intentional tort in a work setting, directed a verdict in favor of appellee. On March 7, 1984, the trial court entered a judgment reflecting its granting of appellee's motion for a directed verdict.

Appellant filed a timely notice of appeal from the March 7, 1984 judgment, and on September 25, 1985, this court issued a decision and judgment entry reversing the judgment of the trial court and remanding this case for further proceedings on the basis of the Supreme Court of Ohio's decision in *Jones v. VIP Development Co.* (1984), 15 Ohio, St. 3d 90. *Fuchsman v. Dallas & Mavis Forwarding Co.* (Sept. 25, 1985), Ross App. No. 1124, unreported. On December 5, 1986, the Supreme Court of Ohio issued a decision vacating both our decision and the judgment of the trail court, remanding this cause to the trial court for "further proceedings including the validity and impact of Am. Sub. S.B. No. 307." *Fuchsman v. Dallas & Mavis Forwarding Co.* (1986), 28 Ohio, St. 3d 12.

On May 31, 1988, the trial court granted appellee's motion for leave to file summary judgment and on June 27, 1988, appellee field its motion for summary judgment. On August 16, 1988, appellant filed a memorandum contra appellee's motion for summary judgment. On November 4, 1988, the trial court granted appellee's motion for summary judgment.

Appellant's sole assignment of error essentially asserts that the trial court erred in granting appellee's motion for summary judgment since the pertinent evidence indicated that appellant's decedent was required to utilize a known hazardous procedure and reasonable minds could infer that the employers also knew that the utilization of said procedure was substantially certain to cause harm.

Civ. R. 56(C) provides, in pertinent part, as follows:

Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor.

Summary judgment is appropriate when the following have been established: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one

conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Bostic v. Connor* (1988), 37 Ohio St. 3d 144, 146; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St. 2d 64, 66.

The burden of showing that no genuine issue exists as to any material fact falls upon the moving party in requesting a summary judgment. *Harless, supra,* at p. 66. Accordingly, the moving party must state specifically which areas of the opponent's claim raise no genuine issue of material fact and such assertion may be supported by affidavits or otherwise as allowed by Civ. R. 56(C). *Mitseff v. Wheeler* (1988), 38 Ohio St. 3d 112, 115.

The Workers' Compensation Act operates as a balance of mutual compromise between the interests of the employer and the employee whereby employees relinquish their common law remedy and accept lower benefit levels coupled with the greater assurance of recovery and employers give up their common law defenses and are protected from unlimited liability. *Blankenship v. Cincinnati Milacron Chemicals* (1982), 69 Ohio, St. 2d 608, 614.

Pursuant to a 1924 amendment to the Ohio Constitution, all rights of injured employees to bring an action at law for damages against an employer amenable to and complying with the provisions of the Workers' Compensation Act were extinguished; thereafter, every injury sustained in the course of and arising out of employment was made compensable under provisions of the Workers' Compensation Act. OHIO CONST. ART. II, SEC. 35; see also *State, ex rel. Engle v. Industrial Comm.* (1944), 142 Ohio St. 425. In *Blankenship, supra,* the Supreme Court of Ohio established an exception to the rule of exclusivity of the workers' compensation recovery for work-related injuries by holding that employees were not precluded by Section 35, Article II of the Ohio Constitution nor by the Workers' Compensation Act from actions against employers for intentionally tortious conduct. The *Blankenship* court held, *supra* at p. 615, that affording an employer immunity for his intentional behavior would not promote the objective of a safe and injury-free work environment since an employer could commit intentional act with impunity with the knowledge that, at the very most, his workers' compensation premiums may rise slightly.

The Supreme Court of Ohio subsequently attempted to establish a test for "intent" in such workers' compensation intentional torts cases. In *Jones, supra,* it held that an intentional tort is an act committed with the intent to injure another, or "committed with the belief that such injury is substantially certain to occur." *Jones, supra* at paragraph one of the syllabus (emphasis added).

In reaction to the *Jones* decision, and following this court's September 25, 1985 decision and judgment entry herein on August 22, 1986, the General Assembly enacted Am. Sub. S.B. No. 307 which amended the Workers' Compensation Act to, *inter alia,* include a strict definition of "[s]ubstantially certain" so that such term would mean that an employer acts with "deliberate intent" to cause an employee to suffer injury, disease, condition, or death. R.C. 4120.80(G)(1).

In order to assess the propriety of the trial court's entry of summary judgment in favor of appellee herein, we must initially determine the applicable law. In this regard, we note that the Supreme Court of Ohio's December 5, 1986 decision explicitly required that the trial court consider the validity and impact of Am. Sub. S.B. No. 307 on the case at bar. R.C. 4121.80(H) provides as follows:

> This section applies to and governs any action based upon a claim that an employer committed an intentional tort against an employee *pending in any court on the effective date of this section* and all claims or actions filed on or after the effective date, notwithstanding any provisions of any prior statute or rule of law in this state. (Emphasis added.)

When an appeal has been commenced but the court has not yet disposed of the case on its merits, the case is pending for the purpose of applying R.C. 4121.80. *Kunkler v. Goodyear Tire & Rubber Co.* (1988), 36 Ohio St. 3d 135, syllabus. In the case *sub judice,* on August 22, 1986, this case had been appealed to the Supreme Court of Ohio, but not yet disposed of on the merits; therefore, it was pending for the purpose of applying R.C. 4121.80. Since R.C. 4121.80(G)(1) removes employees' potentially viable causes of action by imposing a newer, more difficult statutory definition than the intentional tort standard enunciated in *Jones, supra,* and thus constitutes a limitation, or denial of, a substantive right, it consequently caused the statute to fall within the ban against

retroactive laws established by Section 28, Article II of the Ohio Constitution. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, paragraph four of the syllabus. *A fortiori,* R.C. 4121.80(G)(I) may not be retroactively applied to workers' Compensation intentional tort cases arising before August 22, 1986, including the instant case. *Steven v. Pusey & Jones* (1989), 43 Ohio St. 3d 63. Thus, the applicable standard to be applied is that set forth in *Jones, supra,* and further explained by subsequent decisions by the Supreme Court of Ohio.

However, the Supreme Court of Ohio's statement of the test in *Jones, supra,* led to no uniform application of the theory and impelled courts, counsel, and legal authorities to "apply their own often contradictory interpretations of this standard upon a wide variety of fact patterns." *Van Fossen, supra* at p. 109. Consequently, the Supreme Court in *Van Fossen, supra*; *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St. 3d 124; and *Kunkler, supra,* attempted to explain *Jones, supra,* as to what evidence was sufficient to indicate "substantial certainty". The Supreme court's stated objective in such attempted explanation of *Jones* was to "*significantly limit* [] the areas within which 'intent' on the part of the actor may be circumstantially inferred." *Van Fossen, supra,* at p. 117 (Emphasis added).

The Supreme Court noted as follows:

> To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. Where the risk is great and the probability increase that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employers knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk - something short of substantial certainty - is not intent.

*Van Fossen, supra,* at paragraph six of the syllabus; *Pariseau, supra,* at p. 128-129;

*Kunkler, supra,* at p. 139; Prosser & Keeton, Law of Torts (5 Ed. 1984) 35-36, Section 8.

The Supreme Court then determined that in order to establish "intent" for the purpose of providing the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty and not just a high risk; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. *Van Fossen, supra,* at paragraph five of the syllabus; see also *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St. 3d 190, syllabus.

In granting summary judgment, the trial court determined with respect to the first prong, that there was "no evidence" to suggest that appellee had any knowledge that the procedure used was dangerous. Such conclusion is in partial contravention of the trial court's prior determination that "clearly there is evidence that there was corporate knowledge of the manner in which [the towing of dual gliders] was being done and nothing was done about it." Tr. 227.

Although appellee contends that the trial court was correct in finding that there was no genuine issue of material fact as to whether it had knowledge that the towing procedure utilized, i.e. transportation of dual glider assemblies with a long, flexible tow chain, was dangerous, it must be emphasized that where the facts alleged are such that reasonable minds could differ as to whether the defendant's conduct was intentional, a jury question is created which ordinarily may not be resolved by summary judgment. *Kunkler, supra,* at p. 140; *Jones, supra,* at p. 96; *Cascone v. Herb Kay Co.* (1983), 6 Ohio St. 3d. 155, paragraph two of the syllabus.

With respect to this first prong of the Supreme Court's intent test, part of the relevant Civ. R. 56(C) evidence included an OSHA report admitted at trial wherein under the caption "EMPLOYER KNOWLEDGE", the OSHA investigator noted that two people had stated during the closing conference that they "knew"

the towing procedure utilized at the Chillicothe facility "was a hazard", as well as the trial testimony of Schuettenberg, the terminal manager, that he and Katzenstein were present at the closing conference with the OSHA investigators. In that such evidence raises the reasonable inference that appellee knew prior to the August 18, 1981 incident that its towing procedure was dangerous, the trial court erred in determining that the first prong of the *Van Fossen* intent test was not, as a matter of law, met herein. However, in that all three parts of the test must be met prior to the requisite intent being established, such error is not reversible unless there also exists genuine issues of material fact concerning the second and third prongs of the *Van Fossen* test.

The second part of the *Van Fossen* intent test requires knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty and not just a high risk. This test provides that the employee has the burden of proving by a preponderance of the evidence that the employer had "*actual knowledge*" of the exact dangers which ultimately amounted to substantial certainty that an injury would take place. *Van Fossen, supra,* at p. 112; *Sanek v. Duracote Corp.* (1989), 43 Ohio St. 3d 169, 172. The burden to demonstrate knowledge amounting to a substantial certainty that an injury or death would take place never leaves the plaintiff. *Pariseau, supra,* at p. 127.

In the case at bar, we agree with the trial court's conclusion that the record is devoid of any evidence indicative of actual knowledge on the part of appellee that its admittedly hazardous procedure of towing dual glider assemblies with a lengthy, flexible tow chain was substantially certain to cause injury or death to its employees. One of the factors utilized by the Supreme Court to find that an employer was entitled to summary judgment on an intentional tort claim of an employee was that there was "absolutely no evidence of other incidents tending to show that the facility was a dangerous instrumentality." *Van Fossen, supra,* at p. 118. Similarly, in the instant case, although appellant's complaint alleged that appellee knew that other of its employees had been injured previously in transporting gliders without positive braking devices, the appellee's answer and the pertinent evidence admitted, including appellee's sworn and notarized

answers to interrogatories, explicitly refuted such allegation.

In an action by an employee against his employer alleging an intentional tort, upon motion for summary judgment by the defendant employer, the employee must set forth specific facts which show that there is a genuine issue of whether the employer had committed an intentional tort against his employee. *Van Fossen, supra,* at paragraph seven of the syllabus; Civ. R. 56(E). Appellant herein rested upon the mere allegation of his complaint with regard to his contention of prior incidents of employee injuries utilizing such towing method and failed to set forth specific facts regarding these prior incidents after appellee adduced Civ. R. 56(C) evidence in addition to the mere denial of its answer to rebut such allegation. *Mitseff, supra.* Therefore, there was no genuine issue of material fact as to whether prior injuries to appellee's employees had occurred.

Appellant cites *Kunkler, supra,* and additionally relies upon the language contained in the OSHA determination in support of her argument that the second prong of the intent test had been sufficiently established in order to preclude summary judgment. In *Kunkler, supra,* the Supreme Court affirmed the appellate court's reversal of the entry of summary judgment in the defendant employer's favor where an employee stated in a deposition that on three occasions prior to a March 25, 1982 explosion and fire, he had experienced an explosion in a machine at the employer's plant and had reported all three explosions to his supervisor, who had told him to "run the thing anyway." Manifestly, *Kunkler* is inapposite to the case at bar where the facts herein do not indicate *any* prior incident involving either the two man or three man towing procedure utilized at appellee's Chillicothe plant which resulted in any problem, let alone any injury or death to an employee. *Van Fossen, supra.*

Moreover, in the case at bar, appellant's decedent interposed himself physically between the dual glider assembly and the pickup truck, which was not the ordinary procedure utilized by the crew members. In fact, Keown noted that this was a "mistake" on the part of appellant's decedent. Keown further testified that when they had used the two man procedure in the past, he had gotten out of the truck to throw the wood block at a wheel of the dual glider assembly. Although Keown noted that sometimes he would get out of his truck and walk back and "hold" the glider, he specified

that this depended on how fast they were moving and he did not testify that he would ever interpose his body between the truck and the dual glider assembly.

With respect to appellant's reliance on the language of the OSHA citation in support of his contention of appellee's knowledge that its towing procedure would cause injury or death to a "substantial certainty", the aforementioned citation only stated that appellee failed to furnish a place of employment "free from recognized hazards that were causing or were likely to cause death or serious physical harm to employees". Certainly, there is a distinction between knowledge that something is "likely" to cause death or serious physical harm to employees and knowledge that a given procedure is "substantially certain" to cause death or serious physical harm to employees. See, e.g. *Van Fossen, supra,* at paragraph six of the syllabus.

In *Sanek, supra,* at p. 172, the Supreme Court of Ohio emphasized that it was "undisputed that prior to the accident (the employer) was never cited or ordered by OSHA inspectors to provide a guard for the moving shafts of these . . . industrial mixers" and that the employer "could hardly be expected to have anticipated the actions of appellee which led to his injury." Analogously, it was undisputed herein that OSHA had never cited nor ordered appellee to change its method of towing dual glider assemblies *prior* to the accident to appellant's decedent, and appellee could not have been expected to have anticipated the actions of appellant's decedent in descending from the glider and placing his body in between the truck and the dual glider assembly.

As noted previously, mere knowledge and appreciation of a high risk to employees is insufficient to state a cause of action against an employer for intentional tort. *Van Fossen, supra*; *Mitchell, supra*; *Pariseau, supra.* There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved and such conduct may be characterized as gross negligence or wantonness on the part of the employer; however, in view of the overall purposes of the Workers' Compensation Act, such conduct should not be classified as an "intentional tort" and therefore an exception, under *Blankenship* or *Jones,* to the exclusivity of the Act. *Van Fossen, supra,* at p. 117; *Sanek,* *supra,* at p. 172-173. Moreover, in *Mitchell, supra,* at p. 193, the Supreme Court stated, in pertinent part, as follows:

> Virtually every injury in the workplace can be made the basis for a claim of intentional tort if the unsupported conclusion that the employer intended to injure the employee is allowed to prevail over factual allegations which preclude the possibility of intentional tort. We do not serve the interest of employees, employers or the administration of justice in the already over-docketed courts of Ohio if we permit claims to go forward which, on the face of the pleading, have no chance of success.

Based upon the foregoing, and despite appellee's lack of safety measures or warnings regarding the movement of dual glider assemblies prior to the date of the subject incident, we are persuaded that the pertinent evidence adduced herein does not create a genuine issue of material fact as to whether appellee actually knew that its towing procedure was substantially certain to cause harm to appellant's decedent, particularly where the decedent deviated from such procedure by interposing his body between the dual glider assembly and the pickup truck.

Additionally, we agree with the trial court's conclusion that, as a matter of law, the third element of the intent test, i.e. knowledge on the part of appellee that it acted to require appellant's decedent to perform the dangerous task was not established with the sufficiency required to defeat appellee's motion for summary judgment where it was uncontroverted that Roy Keown was not a foreman and was an employee who was a member of the bargaining unit and, more importantly, the record is devoid of any evidence suggesting that appellee mandated that the decedent, as a steerer of the dual glider assembly, descend from the glider and interpose his body between the assembly and the pickup truck to physically stop the dual glider.

Accordingly, in that, after applying the test to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee as set forth in *Van Fossen* and *Mitchell, supra,* we conclude that after construing the evidence most strongly in appellant's favor, there is no genuine issue as to any material fact, that appellee is entitled to judgment as a matter of

law, and that reasonable minds can come to but one conclusion and that conclusion is adverse to appellant. Therefore, the trial court properly granted summary judgment in favor of appellee.[2] For all of the foregoing reasons, appellant's assignment of error is overruled, and the judgment of the trial court is affirmed.

It is ordered that Appellee recover of Appellant costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

Any Stay previously granted by this Court is hereby terminated as of the date of filing of this Entry.

*JUDGMENT AFFIRMED.*

STEPHENSON, J., Concurs in
  Judgment and Opinion.
ABELE, J., Concurs in
  Judgment and Opinion.

---

[1] This memorandum noted that glider kits presented a "hazard" since they would continue to roll unless a positive means of stopping was provided and it was further mandated that very short or rigid towing hook-ups be used in the towing procedure.

[2] It should be noted that Justice Holmes, who wrote the majority opinion for the Supreme Court in Van Fossen, supra, also dissented from the Supreme Court's December 5, 1986 decision herein. In such dissent, he noted that under the "substantial certainty" test of Jones, supra, the trial court "properly directed a verdict for the defendant based upon the facts presented within this case" and that "'reasonable minds' should not differ as to whether an intentional tort was committed by the . . . company." Fuchsman, supra, at p. 13.