### Jenkins v. Quincy Foundry
### Case No. 8-88-26
### Logan County (3rd)
### Decided February 23, 1990
[Cite as 1 AOA 132]

*Messrs. McCarthy, Palmer, Volkema & Becker, Mr. Daniel R. Volkema, Attorney at Law, 580 South High Street, Suite 315, Columbus, Ohio 43215, For Appellants,*

*Messrs. Freund, Freeze & Arnold, Mr. Gordon D. Arnold, Attorney at Law, 1000 Talbott Tower, 131 North Ludlow Street, Dayton, Ohio 45402, For Appellee.*

GUERNSEY, J.

This is an appeal by the plaintiffs, Russell H. Jenkins and Nancy Jenkins, husband and wife, "from the final judgment dismissing Nancy Jenkins' loss of consortium claim on October 29, 1987 and dismissing the remainder of Russell Jenkins' intention [sic] tort claims on the 2nd day of December, 1988."

The action, filed in the Court of Common Pleas of Logan County on August 6, 1986, was founded on personal injury incurred by Jenkins while working in his employment by Quincy on January 21, 1986, and subsequently joined other defendants, who were dismissed prior to the entry of the summary judgment rendered on December 2, 1988, in favor of Quincy.

The judgment as to consortium was entered in response to Quincy's motion that the prayer for damages be struck from plaintiffs' amended complaint and the claim for loss of consortium be dismissed.

The plaintiffs thereafter filed their motion for relief from this judgment.

In its judgment of December 2, 1988, rendered on Quincy's motion for summary judgment, the lower court considered "the materials filed by the parties pursuant to Ohio Civil Rule 56", relied on *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, found, among other things, that there has been no showing of any intentional misconduct directed toward plaintiff or any other employee, awarded summary judgment in favor of Quincy, and ruled that the motion of plaintiffs for relief from the judgment striking the prayer for damages and dismissing the claim for consortium, was thereby rendered moot.

The plaintiffs have set forth three assignments of error.

FIRST ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED BY GRANTING DEFENDANT'S MOTION TO STRIKE THE PLAINTIFFS MONETARY DEMAND FROM THE COMPLAINT FOR AN INJURY THAT OCCURRED BEFORE AUGUST 22, 1986.

In their amended complaint plaintiffs, after alleging his injury from the collapse of a mold causing molten iron to pour upon his left leg and foot, alleged that his injuries "were the direct and proximate result of the intentionally tortious conduct of the defendant, Quincy Foundry, in that it was substantially certain that plaintiff or other workers would receive severe injuries as the result of the required use of knowingly unstable molds, by the failure to provide flame-retardant clothing and personal protective equipment, by the failure to provide adequate routes of escape and by violating applicable Federal and Ohio laws." The prayer of the complaint sought for plaintiff husband one million dollars each of compensatory and of punitive damages and sought for plaintiff wife one hundred thousand dollars of compensatory damages.

Plaintiffs now assert that the amendments of R.C. 4121.80, effective August 22, 1986, after the complaint was filed but before the *amended* complaint was filed, and which, among other things, removed from the courts any jurisdiction to determine damages in an intentional tort action for employee injuries (see R.C. 4121.80(D), placing the determination of same with the industrial commission), constitute a limitation, or denial of, a substantive right, within the ban against retroactive laws established by Sec. 28, Article II of the Ohio Constitution.

The Supreme Court so held in paragraph 4 of the syllabus of *Van Fossen, supra,* with respect to subdivision (G) of R.C. 4121.80 reflecting a new standard of intent for causes of action against employer's for intentional torts. As subdivision (D) of R.C. 4121.80 respecting the determination of damages exclusively by the industrial commission applies only to determinations by the court that the employee or his estate is entitled to an award under this section, that provision cannot possibly have retroactive application to causes of action arising before August 22, 1986, the section's effective date.

See also *Massey* v. *Q.M.C., Inc.* (6/20/88), Marion County App. No. 9-87-32, unpublished; and *Courtad* v. *Whirlpool Corporation* (1989), 48 Ohio App. 200.

We thus find the first assignment of error well taken but whether such error is prejudicial depends upon our consideration hereafter of the third assignment of error.

SECOND ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION TO DISMISS THE PLAINTIFFS' DERIVATIVE CLAIM FOR LOSS OF CONSORTIUM FOR AN INJURY WHICH OCCURRED BEFORE AUGUST 22, 1986.

This assignment of error involves essentially the same analysis as the first assignment of error except for the fact that it relates to the provisions of subdivisions (B) and (H) of R.C. 4121.80, making the remedy prescribed in that statute the exclusive remedy for any action based upon a claim that an employer has committed an intentional tort against an employee. By the same reasoning as we have set forth under the first assignment of error the claim of consortium relating to an intentional injury occurring before August 22, 1986, could not be denied by retroactive application of the provisions of R.C. 4121.80.

Defendant would have us believe under the authority of *Bevis* v. *Armco Steel Corp.* (1951), 156 Ohio St. 295, that R.C. 4121.80 could not affect a substantial right of the plaintiff wife because she had no action for loss of consortium prior to its adoption. We do not agree. The syllabus of *Bevis* merely denies to the wife an action for loss of consortium "where such loss of consortium has resulted *from a compensable occupational disease* of her husband occasioned in the course of and arising out of his employment in Ohio." (Emphasis added.) The denial of a cause of action for loss of consortium arising from an intentional tort injury established by a common law action is beyond the scope of the *Bevis* syllabus.

In our opinion, based on the alleged intentional tort, plaintiff wife had an action for loss of consortium prior to August 22, 1986, which could not be barred by the provisions of R.C. 4121.80 and the trial court committed error in doing so. Again, however, the prejudice of such error, if any, must be determined by our consideration of the third assignment of error.

THIRD ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WHERE THE PLAINTIFFS RESPONDED THERETO BY SUBMITTING SWORN TESTIMONY BY EXPERTS AND WITNESSES THAT (1) THE EMPLOYER HAD KNOWLEDGE OF THE EXISTENCE

OF A DANGEROUS PROCESS, PROCEDURE, INSTRUMENTALITY, OR CONDITION WITHIN ITS BUSINESS OPERATION; (2) THE EMPLOYER HAD KNOWLEDGE THAT IF THE EMPLOYEES WERE REQUIRED BY VIRTUE OF THEIR EMPLOYMENT TO BE SUBJECTED TO SUCH DANGEROUS PROCESS, PROCEDURE, INSTRUMENTALITY, OR CONDITION, THEN HARM TO THEM WOULD BE A SUBSTANTIAL CERTAINTY, NOT JUST A HIGH RISK; AND (3) THAT THE EMPLOYER, UNDER SUCH CIRCUMSTANCES, AND WITH SUCH KNOWLEDGE, DID ACT TO REQUIRE THE EMPLOYEE TO CONTINUE PERFORMING HIS EMPLOYMENT TASK.

The foregoing assignment of error sets forth the standards set forth in paragraph 5 of the syllabus of *Van Fossen, supra,* which must be demonstrated to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employer. In our opinion these are the proper standards applicable to determine whether the employment injury here was intentional.

We cannot determine from the lower court's summary judgment just which evidentiary documents that court considered in deciding the motion for summary judgment. However, from our examination of the record we find that its determination should have been confined to the depositions of plaintiff Jenkins, of Robert Rose and of Will Godsey, as well as the proper portions of the affidavits of plaintiff Russell H. Jenkins and of Fred Melof. The deposition of John Haas may not be considered because not filed with the lower court until after the lower court rendered its summary judgment. The depositions of Fred Melof, Billy Robinson and Melvin Newcomb cannot be considered because never filed. The extracts from the depositions of John Haas, Billy Robinson and Melvin Newcomb, attached as exhibits to the affidavit of plaintiff's counsel, Shauna K. McSherry, cannot be considered because being merely extracts out of context not certified as depositions they are not permissible evidentiary documentation under Civ. R. 56. Applying the usual presumption of regularity, it not appearing otherwise, we presume that the lower court considered all the evidentiary documentation entitled to consideration and did not consider any evidentiary documentation not entitled to consideration. We likewise will confine our consideration to the evidentiary documentation properly before the lower court on the motion for summary judgment. What then do those documents show as to the facts of plaintiff's injury?

At the time of his injury, January 21, 1986, plaintiff had been continuously employed by Quincy since 1979 at various tasks in its foundry working on a moving assembly line involving the pouring of molten metal in black sand molds to form metal castings for the foundry's customers. The area in which plaintiff worked was known as the "jacket line." Empty black sand molds moved the line from another area to plaintiff's station, at which point it was plaintiff's duty, using a hoist, to place a metal jacket over the mold with weights on top, the purpose being to hold the sand mold and sand core contained therein in proper shape while the mold was being filled with molten metal and while the metal went through the initial stages of hardening. From plaintiff's station the mold continued on the moving assembly line to the place where the molten metal was poured into the top of the mold, thence continued on the moving assembly line, making a U-turn, and returning to plaintiff's station. It was then plaintiff's duty to strike the jacket with his hammer and with the hoist to lift the jacket and weights from the mold placing them on an empty mold arriving on the other side of the assembly line. Thus, on one side of the assembly line plaintiff puts on the jackets, and on the other side removes them and, at the speed which the line was moving, it took seven minutes from the time the molds left plaintiff's station until they returned thereto. It is undisputed that only those workmen pouring molten metal were required to wear protective gear, including aluminized chaps covering their legs and the tops of their feet, to protect them against spills of molten metal and resultant burns; that the men working on the jacket line were not required to wear protective chaps but did wear boots which they obtained from the company. Plaintiff's foreman testified that, if available, chaps were supplied to the jacket line workers when they asked for them but, if not available, jacket line workers were required to continue their work without chaps.

In the ordinary course of events, once the metal jackets had been removed from the sand

mold surrounding the casting, the mold and casting continued moving on the assembly line to a "shake out" area were the sand mold and its sand core were removed from the metal casting. At this point defective castings were classified and discarded as scrap and records were kept of the cause, which then appeared, of the defect in the casting. Aisles existed in the vicinity of the assembly line which from time to time were kept open but at other times became cluttered with equipment, molds, cores and castings.

On the day, and at the time and place in question, plaintiff's injury occurred when he was removing a metal jacket from a sand mold which had returned on the assembly line to his station. At that time molten metal broke out through the sand mold pouring down inside his left boot and severely burning his left leg and left foot from the shin on down. Plaintiff testified that in the prior ten years molten metal had broken out of molds on the jacket line on only two occasions resulting in no injuries. He testified that on another occasion between 1979 and 1981 a mold had broken out in the front room pin lift area when a metal jacket was being removed, with the molten metal injuring another employee, but in the front room pin lift area the molds are stationary and do not recede away from you whereas in the jacket area the molds keep moving away from you, the velocity of the molten spray coming toward you lessens, and you have a chance to jump out of the way, which he managed to do on the two occasions when there had been a break out in his area. Plaintiff's foreman (Rose) on the jacket line at the time of the injury testified that he had been employed at the foundry since 1953 and during that time no one had ever been injured on the jacket line. There was also testimony that had plaintiff been wearing the protective chaps at the time of the break out, the molten metal would probably have run on to the floor and plaintiff would not have been injured. Plaintiff testified that he immediately hopped on his right leg through the moving assembly line toward a brick wall against which he leaned while kicking his left leg to shake off his burning boot and the molten metal. Plaintiff further testified that because of the clogged aisles he had to be removed on a stretcher and that because of the blocked aisle had to stand against the brick wall approximately twenty five minutes to half an hour because it took that long to get a stretcher to him when he was then passed by human chain over the blocked aisle. Plaintiff finally testified, in answer to the question of whether he knew personally of any facts that the accident was substantially certain to occur, "To the best of my knowledge, not at this time."

Plaintiff also filed contra Quincy's motion for summary judgment the affidavit of Melof, an expert in foundry safety, who stated, among other things, that he had read the depositions of plaintiff, plaintiff's foreman, and another employee, as well as the OSHA investigation report (not in the record) regarding Quincy Foundry and the plaintiff's injury; that he finds that Quincy Foundry violated Federal OSHA law and the Ohio Administrative Code in not providing employees on the jacket line with protective leggings and chaps and in not keeping passageways open to and from the jacket line area; that such protective clothing is absolutely necessary anywhere an employee could come into contact with molten metal; that breaks out of molten metal on jacket removal lines are not unusual occurrences; that Quincy knew that by failing to provide such protective clothing they were creating a dangerous process and procedure within their business operation, subjecting their employees to more than just a high risk of harm, but that harm would come with substantial certainty; that the blocking of the passageway violated Federal law; that Quincy knew that such blocking would cause additional injury to an employee by delay in treatment of an injured employee, which delayed treatment would cause additional harm with absolute certainty, which, in this case, essentially baked plaintiff's foot; and that in his experience "this is one of the worse [sic] cases of management *neglect* of employee safety that I have come across in almost 60 years as a safety consultant." (Emphasis added.)

The respective burdens of the parties with respect to the motion for summary judgment are set forth in paragraph seven of the *Van Fossen* syllabus:

"7. Upon motion for summary judgment pursuant to Civ. R. 56, the burden of establishing that the material facts are not in dispute, and that no genuine issue of fact exists, is on the party moving for summary judgment. * * * However, in that Civ. R. 56(E) requires that a party set forth specific facts showing that there is a genuine issue for trial, such party must so perform if he is to avoid summary judgment. Accordingly, in an action by an employee

against his employer alleging an intentional tort, upon motion for summary judgment by the defendant employer, the plaintiff employee must set forth specific facts which show that there is a genuine issue of whether the employer had committed an intentional tort against his employee."

Defendant Quincy filed its motion for summary judgment supported by the deposition of the plaintiff. These filings created a shift from the burden of the defendant to show that no genuine issue of fact exists and that the defendant was entitled to summary judgment to the burden of the plaintiff "to set forth specific facts which show that there is a genuine issue of whether the employer had committed an intentional tort against his employee." This the plaintiff attempted to do by refiling the plaintiff's deposition, and filing the depositions of Robert Rose and Will Godsey, as well as the affidavits of plaintiff and Fred Melof previously referred to. The issue then becomes whether the plaintiff met his burden of showing a genuine issue of fact requiring trial as to any of the three criteria set forth in paragraph 5 of the syllabus in *Van Fossen* to be demonstrated in order to establish "intent" for the purpose of proving the existence of an intentional tort committed by Quincy against the plaintiff.

There seems to be no doubt that if the employer knew of the existence of danger and knew of the substantial certainty and not just a high risk of harm to plaintiff, the employer, with such knowledge, did, nevertheless, require the plaintiff to continue to perform the tasks of his employment. Our considerations involve, as did the lower court's, the questions raised as to the demonstrations of whether the employer had knowledge of the existence of a condition within its operation dangerous to plaintiff and of whether the employer then had knowledge that if plaintiff were subjected by his employment to such dangerous condition, then harm to the plaintiff would be a substantial certainty and not just a high risk.

Notwithstanding the highly conclusory affidavit of the expert witness that both the condition of removing a metal jacket from a mold traveling on the jacket line without protective chaps on the employee, and the condition of working on the jacket line with access aisles blocked with materials constituted dangerous conditions, there was no evidence that the defendant employer knew that these conditions were dangerous. The plaintiff testifies as to the existence of only two break outs in the last ten years, neither of which caused injury, and his foreman knew of no injuries occurring on the jacket line since his employment in 1953. There is no evidence demonstrating that the employer even knew of the non-injurious breakouts testified to by the plaintiff. Indeed, the plaintiff testifies that he was involved in each of the two breakouts which did occur and readily side stepped the molten metal. For these same reasons, there being no evidence of any molten metal injuries on the jacket line, there was no evidence of the blocking of the aisles constituting a danger to employees on the jacket line which danger was known to the employer. For identical reasons, plaintiff not setting forth specific facts which showed a dangerous condition either as to the protective chaps or the blocked aisle, plaintiff then supplied no specific facts showing knowledge by the employer that if plaintiff were subjected to these conditions of his employment, harm to the plaintiff would be a substantial certainty and not just a high risk. Compare *Massey* v. *Q.M.C., Inc.* (June 20, 1988), Marion County App. No. 9-87-32; and *Workman* v. *Ball Corporation* (Dec. 16, 1988), Hancock County App. No. 5-87-26, jurisdictional motion overruled April 5, 1989.

Though we appreciate that the Melof affidavit speaks from Melof's experience such experience was not in defendant's foundry and does not purport to supply *specific facts* as to the two elements of knowledge of the employer Quincy required to prove the existence of an intentional tort. Plaintiff likewise relies heavily on the evidence brought out in the Godsey deposition as to the trouble which the defendant had been having with the particular type of mold involved as shown by the scrap reports. However, these reports merely account for defective *castings* for whatever reason, do not show any breakouts of the mold in the jacket area, and, in any event, Godsey did not examine and determine the cause of each defective casting, nor did he prepare the reports to which he testified. Such evidence did not, therefore, supply any inference of danger in removing metal jackets from such type mold. Plaintiff also relies heavily on *Kunkler* v. *Goodyear Tire & Rubber Co.* (1988), 36 Ohio St. 3d 135, as being a similar case where a summary judgment was set aside by the Supreme Court. However, examination of that case shows that the material issue of fact

therein involved was an unresolved issue as to notice of danger being given to the employer, the giving of such notice being disputed. Here, as we have seen, there is adequate evidence that the employer had knowledge of the conditions under which the plaintiff was working, but there is no evidence, even when construed in the plaintiff's favor, that the employer had knowledge that such conditions constituted a danger to plaintiff or knowledge that, if subjected to these conditions, harm to plaintiff could be a substantial certainty and not just a high risk.

We conclude accordingly that the third assignment of error is not well taken, which conclusion also compels a conclusion that the errors found under the first two assignments of error were not prejudicial and did not constitute reversible error.

Finding no prejudicial error in the particulars assigned and argued, the judgments are affirmed.

*Judgments affirmed.*

BRYANT, J., (Presiding) and COLE, J., concur.

J. THOMAS GUERNSEY, J., retired, of the Third Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Ohio Constitution.

RALPH D. COLE, JR., J., retired, of the Third Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Ohio Constitution.